Richard M. Garbarini (RG 5496)
GARBARINI FITZGERALD P.C.
250 Park Avenue 7th Floor
New York, New York 10177
Telephone: (212) 300-5358
Facsimile: (347) 218-9478

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
BRYAN EICH, individually and on behalf of all other similarly situated copyright holders,

                              Plaintiffs,

                    v.

RHAPSODY INTERNATIONAL, INC. d/b/a NAPSTER,

                              Defendants.
---------------------------------------------------------------x

Index No.: 17-cv-5132

**CLASS ACTION COMPLAINT AND JURY DEMAND FOR DAMAGES FOR COPYRIGHT INFRINGEMENT AND UNDERPAYMENT OF ROYALTIES**

Plaintiff BRYAN EICH, by and through his attorneys at GARBARINI FITZGERALD P.C., brings this Complaint and Jury Demand against defendant RHAPSODY INTERNATIONAL, INC. d/b/a NAPSTER ("RHAPSODY") based on Defendant's infringement of Plaintiff's and the Putative Class' copyrighted musical works pursuant to the Copyright Act and Copyright Revisions Act, 17 U.S.C. §§ 101 *et seq*. (the "Copyright Act" or "Act").

NATURE OF THE ACTION

1. Plaintiff owns the publishing rights associated with one copyright registration for his album *Sleeping By A Wire*, U.S, Copyright Registration No. SRu 661 491.

2. Defendant RHAPSODY owns and operates an internet music streaming service

which is subject to § 115 of Title 17 of the United States Code. As such, Defendant was required to serve a Notice of Intent to Obtain Compulsory License ("NOI"), in the form proscribed by 37 CFR § 201.18, within thirty (30) days from the date each copyrighted musical composition was included on its service and prior to distribution.

3. Defendant engaged in a systematic process of infringing the copyrighted recordings of Plaintiff and the Putative Class by reproducing, publishing, and transmitting the copyrighted recordings of Plaintiffs and the Putative Class. Defendants failed to serve a valid Notice of Intent for a Compulsory License (NOI) pursuant to Section 115 of the Act prior to exploiting Plaintiff's and the Putative Class' recordings.

4. When Defendant launched its streaming service, it entered into blanket agreements with the major and minor record labels for the rights, including the publishing rights, to their catalogue of recordings. The major and minor record labels represent approximately 70% of the recordings available.

5. Defendant simply ignored their obligations to serve NOIs and/or pay the appropriate publishing royalties for all independent artists like Plaintiff and the Putative Class.

**PARTIES**

6. At all times material hereto, plaintiff BRYAN EICH (EICH") was, and is, an artist residing in Queens, N.Y.

7. Upon information and belief, defendant RHAPSODY INTERNATIONAL INC. d/b/a NAPSTER is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business at 1420 Fifth Avenue, Suite 1500, Seattle, Washington 98101. Upon information and belief, RHAPSODY may be served at 500 3rd Street, Suite 460, San

Francisco, California 94107, via legal counsel, copyright agent, an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive.

8. RHAPSODY also maintains a corporate office in New York City at 150 East 42nd St., New York, NY.

## JURISDICTION AND VENUE

9. The jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1338 in that this controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C § 101 et seq.). This action is a civil action over which this court has original jurisdiction.

10. On information and belief, a substantial part of the facts of infringement complained of herein occurs or has occurred in this district, and Defendant is subject to personal jurisdiction in this district because they maintain a headquarters in this district located at 150 East 42nd St, New York, NY.

11. Personal jurisdiction over Defendant is proper in this Court, among other reasons, on the grounds that Defendant, through its interactive web-based subscription service, caused the unlicensed distribution of the Plaintiff's and the Putative Class' copyrighted recordings throughout the State of New York, including within this judicial district.

12. This Court has personal jurisdiction over Defendant pursuant to CPLR § 302 (New York's long-arm statute) due to its continuous and systematic business activities within New York as described below. Defendant has conducted and does conduct business within New York. Defendant, directly or through intermediaries (including distributors, retailers, and others), ships, distributes, offer for sale, sells, and advertises products in the United States, and specifically to New York. Defendant purposefully and voluntarily distributed and reproduce Plaintiff's and the Putative Class' recordings in New York.

13. Venue in this District is proper under 28 U.S.C. § 1391(b) and (c) and/or 28 U.S.C. § 1400(a).

14. Plaintiff has the right to bring the within action pursuant to 17 U.S.C. § 501(b).

15. The copyright in every musical composition at issue was registered in the United States Copyright Office. 17 U.S.C. § § 409-412.

16. Copies of the certificate issued by the U.S. Copyright Office to plaintiff with the U.S. Copyright Office are annexed and incorporated hereto respectively as **Exhibits A.**

17. Plaintiff's Copyrighted Compositions was registered within three months of publication, or thirty days prior to the infringement, and satisfies the registration prerequisite under 17 U.S.C. 412(c).

## CLASS ALLEGATIONS

18. Plaintiff brings this action on behalf of themselves and on behalf of all other similarly situated owners of the publishing a/k/a "mechanical" rights for registered musical compositions, which were published on defendants' streaming service on or after July 7, 2014.

19. The Putative Class is comprised of and defined as follows:

   (a) Plaintiff and a Putative Class of artists who are not subject to a blanket license and who own the publishing rights to their recordings, and submitted those recordings to Defendant through a third party aggregator, and Defendant elected to exploit the recordings on or after July 7, 2014 (the "Putative Class").

20. This action may be properly brought and maintained as a class action because there is a well-defined community of interest in the litigation and the members of the proposed class are clearly and easily ascertainable and identifiable.

21. The class for whose benefit this action is brought is so numerous that joinder

of all class members is impracticable. Plaintiff is informed and believes that there are thousands of class members and that those class members can be readily ascertained from defendant's database files and records, and via discovery in this action.

22. Upon information and belief, Defendant has maintained records of the musical compositions it publishes and/or distributes.

23. The Putative Class members can be readily located and notified of this action.

24. The claims of Plaintiff are typical of the claims of the members of the Putative Class, and his interests are consistent with and not antagonistic to those of the other Putative Class members they seek to represent.

25. Plaintiff holds the rights to an album of music containing 13 recordings (the "Copyrighted Compositions"), all of which were reproduced and/or distributed by Defendant on or after June 7, 2014.

26. Plaintiff, and all members of the Putative Class, have sustained actual pecuniary loss and face irreparable harm arising out of Defendant's continued infringement as complained of herein.

27. Plaintiff has raised a viable copyright infringement claims of the type reasonably expected to be raised by members of the Putative Class, and will vigorously pursue those claims.

28. If necessary, Plaintiff may seek leave of the Court to amend this Complaint to include additional class representatives to represent the Putative Class or additional claims as may be appropriate.

29. Plaintiff is represented by experienced, qualified and competent counsel who is committed to prosecuting this action.

30. Common questions of fact and law exist as to all members of the class that predominate over any questions affecting only individual members of the class.

31. These common legal and factual questions, which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any class member include, without limitation, the following:

 (a) whether Defendant reproduced or distributed or otherwise exploited Plaintiff's and the Class' Copyrighted Compositions via their interactive streaming service on or after July 7, 2014;

 (b) whether Defendant reproduced or distributed or otherwise exploited Plaintiff's and the Putative Class' recordings via their interactive streaming service without first obtaining a license or other required authorization;

 (c) whether Defendant engaged in a system of materially altering documents to obfuscate the infringements;

 (d) whether Defendant's unauthorized reproduction, distribution or other exploitation of registered musical compositions was done willfully, thereby entitling the members of the class to increased statutory damages;

 (e) the basis and method for determining and computing damages; and,

 (f) whether Defendant's conduct is continuing, thereby entitling Plaintiff and members of the Class to injunctive or other relief.

32. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual litigation of the claims of all class members is impracticable.

33. The claims of the individual members of the Class may range from smaller sums to larger sums, depending upon the number of infringements. Thus, for those Putative Class members with smaller claims, the expense and burden of individual litigation may not justify pursuing the claims individually. Even if every member of the class could afford to pursue individual litigation, which is highly unlikely in the independent artist community, the court system could not.

34. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, contradictory, or inconsistent judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

35. On the other hand, the maintenance of this action as a class action presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the class.

36. Plaintiff anticipates no difficulty in the management of this action as a class action.

**GENERAL FACTS**

37. As a general proposition, a copyright confers on the owner the exclusive right to reproduce the copyrighted Composition.

38. Absent a license from the copyright owner, which the owner is free to grant or deny, reproduction of the composition by another constitutes copyright infringement.

39. When Congress enacted the Copyright Act of 1909, it was concerned that exclusivity with respect to musical compositions would give rise to "a great music monopoly." It therefore modified the principle of exclusivity in the case of nondramatic musical compositions by enacting a compulsory license provision which, in defined circumstances, imposed upon the copyright owner a license permitting the mechanical recording of the copyrighted song "on such media as a phonograph record or a piano roll."

40. Although recording technology has changed since 1909, licenses to record musical compositions on such media continue to be called "mechanical licenses."

41. The compulsory mechanical license concept was carried forward in Section 115 of

the Copyright Act of 1976 which, generally speaking, permits one wishing to record a copyrighted nondramatic musical composition to do so in the absence of the copyright owner's consent in exchange for payment of a statutory royalty.

42. But the availability of compulsory mechanical licenses is dependent on the strict limitations of Section 115(b)(1) of the Act which requires in pertinent part that "[a]ny person who wishes to obtain a compulsory license under this section shall, before or within thirty days after making, and before distributing any phonorecords of the Composition, serve notice of intention to do so on the copyright owner."

43. Under section 115, those who seek to make and distribute reproductions of a musical Composition may obtain a license to do so by serving a NOI on the copyright owner, no later than thirty days after making, and before distributing, any phonorecords. 17 U.S.C. § 115(b)(1). Once an entity has served the NOI, which entity must provide statements of account and pay the statutorily prescribed royalties on a monthly basis. 17 U.S.C. § 115(c)(5).

44. The name and address of the owner of the publishing rights is readily ascertained from the third-party aggregator who submits same with the recordings for review.

45. If, for some reason, the name and address of the owner of a given composition cannot be readily identified from the submission records, or the public records of the Copyright Office, the user may file the NOI with the Copyright Office. 17 U.S.C. § 115(b)(1). In that case, the user must pay a filing fee to the Copyright Office but does not need to deposit royalties. See 17 U.S.C. § 115(c)(1); 37 C.F.R. § 201.18(f)(3).

46. The content and method of service of the notice are prescribed by statute and regulation. See 17 U.S.C. § 115(b); 37 CFR 201.18. Defendants could have included all of the recordings submitted by each plaintiff or member of the Putative Publishing Class in a single NOI.

47. The tremendous power granted to defendants under Section 115 is balanced by the strict obligations regarding notice. Defendants intentionally failed to adhere to its Section 115

obligations, while enjoying all of the benefits afforded by Section 115.

48. Section 115 of the Copyright Act governs compulsory mechanical licenses of musical compositions, such that an owner of a musical composition is required to grant a non- exclusive license to anyone who wants to reproduce, offer, and distribute their recordings.

49. Although the mechanical license is compulsory, specific rules must be followed to obtain the license under the law.

50. As for notice, "[a]ny person who wishes to obtain a compulsory license under [Section 115] shall, before or within thirty days after making, and before distributing and phonorecords of the work, serve notice of intention to do so on the copyright owner." Section ll 5(b)[ 1]. The content and method of service of the notice are prescribed by statute and regulation. 17 U.S.C. § 115(b); 37 CFR 201.18.

### Failure to Obtain a Mechanical License

51. When a mechanical license is not obtained, the copyright owners of the songs and the songwriters do not get paid for the reproduction and distribution of their music. For songwriters, like Plaintiff, whose songs are not played on the radio, the royalties earned from streaming revenue is often substantially the largest part of their income.

52. Moreover, reproducing a song without a mechanical license is copyright infringement which may not be cured after the fact by attempting to obtain a compulsory license. Section 115 further provides that "[failure to serve or file the notice required by clause forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords actionable as acts of infringement. .."

53. Senate Report confirms: "Of course, a digital transmission service would be

liable for any infringing digital phonorecord delivery it made in the absence of a compulsory license or the authorization of the musical work copyright owner". Senate Report No. 104-128, S. Rep. 104-128 (1995) at 27.

54. The Senate Report further states:

> If a record company grants a license under its rights in the sound recording only, and does not grant a mechanical license under the copyright in the musical work embodied in the sound recording, **it is the transmission service's responsibility to obtain a license under the musical work copyright**. Senate Report No. 104-128, S. Rep. 104-128 (1995) at 31 (emphasis added).

## AGGREGATORS

55. Aggregators like TuneCore, Distro Kid, or CD Baby, function exactly like a record label for independent artists.

56. The artist checks any one of approximately 30 internet stores, RHAPSODY being one, and the aggregator submits the master recordings to the selected stores on an audition basis only.

57. Each of the aggregators make it very clear that they do not convey the publishing rights.

58. After receipt of the master audition recordings from the aggregator, Defendant may elect to exploit the masters, or reject one or all of the sound recordings due to "technical or editorial specifications".

59. If Defendant elects to exploit the recordings, it is obligated to serve an NOI within 30 days, and before distribution.

## FACTS SPECIFIC TO DEFENDANT

60. Upon information and belief, Defendant RHAPSODY is in the business of, among other things, offering an interactive subscription music service over the internet. Defendant RHAPSODY intentionally infringed Plaintiff's Copyrighted Compositions, by, among other things, making the Copyrighted Compositions available for unlawful and

unauthorized digital download and distribution to the public through its website found at (www.Rhapsody.com) and later through its website found at (us.Napster.com), and through Defendant's mobile device and tablet application, without a license for the musical compositions.

61. Defendant, as a web-based subscription service, is obligated to serve an NOI for every song it offers on its service.

62. Defendant has the same obligations today as it would have had in 1909 (just updated for modern technology through the 1976 amendment and the DPRA and DMCA). Today, however, the Defendant's licensing job has been made simple by a very clear enabling regulation, 37 C.F.R. 385, and the assistance of professional rights organizations ("PROs").

63. Each song on Defendant's service obligates the Defendant to do the following:

  (1) obtain a license and pay a royalty for the performance of the sound recordings – blanket licensees are obtained from professional rights organization BMI, SESAC or ASCAP. The PRO's also collect and distribute the associate royalties (the "Performance Royalties");

  (2) obtain a license and pay a royalty for the physical sound recordings ("Master Royalties"), obtained through CD Baby in the case of Plaintiff, who also collects the royalty; and,

  (3) obtain the section 115 license and pay a royalty for the distribution of the underlying musical composition (the "Mechanical Royalties."), obtained from a music rights organization ("MRO") like Music Reports, SoundSource, Harry Fox Agency or directly from the publisher/composer.

64. Defendant failed to serve NOIs on Plaintiff and the Putative Class.

65. Defendant is an expert in Section 115 statutory framework. At the July 12, 2005 Hearing on "Music Licensing Reform" before the Senate Judiciary Subcommittee on Intellectual Property, Rob Glaser, Chairman and CEO of Defendant, testified on the mechanical licensing framework and described in explicit detail Rhapsody's obligations and what was necessary for it to comply. Mr. Glaser provided a written statement included in the record providing an eloquent recitation which included the follows:

  (a) [Section 115] imposes . . . paper-based and traditional mailing requirements that hinder prospective licensees' ability to efficiently identify copyright owners, license their works and pay royalties. Today's law requires each music service to separately identify the publisher of each of the millions of songs it wants to make available on a

service, <u>which is nearly impossible</u> as no comprehensive database exists with such information. Services must then locate and notify by certified mail each publisher, and regularly inform each publisher of every individual work that is deployed on the service. While this process was acceptable for licensing a dozen works at a time for piano rolls and compact discs, <u>it cannot support an online music service that requires more than a million songs to be viable</u>. We need a system that recognizes the advent of computers and the Internet;

(b) . . . the penalties for noncompliance are draconian: infringement liability plus disqualification from ever obtaining a compulsory license for that work.

(c) . . . the licensing process is unworkable for digital music.

(d) online music services need mechanical licenses for on-demand performances or "streams" even though we have already obtained performance licenses from ASCAP, BMI and SESAC.

(e) today's administrative impossibility - song-by-song licensing combined with the multi-million-dollar burden of determining who owns each song in a multi-million song library.

66. The statement of Rob Glaser which appeared in the Federal Register found on the U.S. Senate's website and found at http://www.judiciary.senate.gov/imo/media/doc/glaser_testimony_07_12_05.pdf.

67. Defendant's CEO eloquent recitation of the exact methods Rhapsody must employ to comply with its obligations demonstrates that Defendant is an absolute expert in the regulations and statutory framework.

68. Defendant's CEO also admitted that it knows Defendant does not comply with its obligations. Mr. Glaser stated: "the licensing process is unworkable for digital music services." "Only a blanket license can offer modern music services non-infringing access to all available music for purposes of lawful commercial distribution, which was precisely Congress's goal when creating the original compulsory mechanical license."

69. In his actual testimony before the Senate Committee, Mr. Glaser admitted Rhapsody does not obtain all of the mechanical licenses for songs on its services, stating:

> Mr. Glaser:   **While we have spent millions of dollars setting up our licensing systems, we simply don't have the resources to procure the millions of individual song licenses the current system requires.**

> Orin Hatch    Now, can you comment for the benefit of the Committee on this difference in perspective and explain what type of works you cannot license and why, so that we will understand that?
> Mr. Glaser.   Well, there are two issues. One has to do with whether we can get a license at all.

70. The Federal Register for the Senate Subcommittee on Intellectual music licensing reform hearing held on July 12, 2005 S. Hrg. 109-102 found on the U.S. Senate website at http://www.gpo.gov/fdsys/pkg/CHRG-109shrg22919/html/CHRG-109shrg22919.htm.

71. It should be noted, in 2009, the Copyright Royalty Board amended the implementing regulations for Section 115 by including a provision that allows for the service of the Notice of Intent for a Compulsory License ("NOI") on the U.S. Post Office if the rights user was unable to locate the rights holder. See 37 C.F.R. 285.2(f). The 2009 amendment made the method of complying with Section 115 significantly easier, yet Rhapsody still elected not to comply.

72. But the argument regarding the difficulty in compliance is a farce. Defendant knew who the Plaintiff was, after all it listed "Bryan Eich" on its website.

73. In less than a few minutes, Defendant could have obtained Plaintiff's address by sending an e-mail to CD Baby or looked it up on the U.S. Copyright Office website.

74. Defendant did not have the three minutes to contact the Plaintiff, and serve the NOI, but it had the time to: (i) review two separate submissions to make sure each was of the standard to include on its service, (ii) upload the recordings to its service, (iii) upload the cover art, (iv) and list the name of EICH on the submission. Defendant knew who the Plaintiff was, it just did not want to contact the Plaintiff or serve the NOIs.

75. Part of Mr. Glaser's testimony on behalf of Rhapsody was to implore the Senate to clarify one thing in the 2005 model, and that related to the payment of royalties not the mechanical licenses.

> "RealNetworks and DiMA disagree that percentage of revenue royalties are prohibited by current law, but we urge Congress to resolve the confusion around this issue and confirm that percentage-of-revenue royalties are permissible under a modern 115 license."

76. Glaser advocated for a single confirmation on the royalty model Rhapsody knew so well.

77. Defendant's in-depth knowledge of its obligations under Section 115, and what it must do to meet those obligations cannot be questioned. It is also unquestionable that Defendant knew in 2005 that it does not, in fact cannot, obtain all of the mechanical licenses. Mr. Glaser's statements only confirm what Plaintiff already knew – Defendant operates with the knowledge that it does not obtain mechanical licenses, and it made a business decision that it was more cost-effective to risk a finding of intentional infringement rather than expend the costs it would take to comply with the law.

78. From 2006 through 2009, Defendant was also one of the key participants in negotiations with the Copyright Royalty Board for the royalty rates and licensing methods under Section 115. On or about January 9, 2006, Defendant petitioned the Copyright Royalty Board ("CRB") to "Participate to determine the rates and terms of royalty payments, for the making and distribution of phonorecords, including digital phonorecord deliveries ("DPDs"), under the statutory license set forth in Section 115 of the Copyright act." Defendant (i) negotiated the rates and terms of Section 115 for three years, (ii) filed written statements, (iii) Mr. Timothy Quirk, Vice President of Music Publishing, Rhapsody America testified before the CRB; and (iv) rebuttal testimony was offered by Alexander Kirk.

## FACTS SPECIFIC TO PLAINTIFF

79. This is Plaintiff's business: making music, performing and offering mechanical and synch licensees for that music.

80. Plaintiff made two submissions to Defendant, and Defendant elected to exploit both submissions.

81. Plaintiff never received an NOI from Defendant.

82. Each of Plaintiff's 13 recordings were actually streamed on Defendant's service in the three years prior to the date of this Complaint.

83. Plaintiff also never received royalties from Defendant, and was unaware Defendant was exploiting his music until on or about May 23, 2017.

84. This is a straight-forward matter of the intentional infringement of the Plaintiff's Copyrighted Compositions.

85. Plaintiff submitted his Copyrighted Compositions to Defendant for audition purposes only.

86. Defendant reproduced and distributed the Copyrighted Compositions.

87. Defendant never served an NOI on Plaintiff.

88. Defendant never paid royalties.

89. Plaintiff had no way of knowing Defendant exploited his Copyrighted Compositions unless Defendant served an NOI prior to distribution.

90. Defendant violated Plaintiff's exclusive rights as provided by 17 U.S.C. § 106.

## FIRST CLAIM FOR RELIEF
## COPYRIGHT INFRINGEMENT
### (On Behalf of Plaintiff and the Putative Class)

91. Plaintiff and the Putative Publishing Class incorporate the allegations contained in the preceding paragraphs as if set forth at length here.

92. Defendant has, without a "mechanical" license under Section 115 from Plaintiff or the Putative Class, reproduced and publicly performed and/or publicly distributed plaintiff's and Class' Copyrighted Compositions through its interactive web-based subscription streaming service.

93. It cannot be disputed that the Plaintiff and the Putative Class have valid, registered copyrights and own the publishing rights to their copyrighted compositions. Defendant reproduced and offered the Copyrighted Compositions for streaming, including permanent and temporary digital download, without a license for the publishing rights, thus infringing Plaintiff's and the Putative Class' rights under Section 115 of the Copyright Act.

94. Irreparable injury is presumed here as Plaintiff and the Putative Class have

established a prima facie case of copyright infringement.

95. Even after defendant was put on notice in a previous actions in this Court just two years ago, Defendant elected to continue to reproduce and publicly perform and/or publicly distribute Copyrighted Compositions.

96. The making or the distribution, or both, of all copyrighted compositions without the payment of proper royalties is actionable as acts of infringement under section 501 and fully subject to the remedies provided by sections 502 through 506 and 509.

97. Each time Plaintiff and the Putative Class was deprived of their statutory royalty entitlement, e.g., by non-payment of royalties, a distinct harm was done to plaintiff's and the Putative Class' property interest.

98. Defendant's predatory conduct was clearly intentional within the meaning of 504(c)(2) for purposes of enhancing statutory damages. Defendant knew that their actions constituted an infringement each time it failed to serve an NOI or make a royalty payment.

99. Defendant's knowledge may also be inferred from its conduct including the reckless disregard of the Plaintiff's and Putative Class' rights (rather than actual knowledge of infringement), which suffices to warrant award of the enhanced damages.

100. Every time Defendant materially altered documents to cover their illegal activity, they demonstrated the clear knowledge of the import of their acts.

101. Plaintiff and the Putative Class may also elect to recover statutory damages pursuant to 17 U.S.C. § 504(c)(2) for willful infringement of up to $150,000, but not less than $30,000, for each infringement of each copyright registration identified in **Exhibit A** and those that will be produced for each member of the Putative Publishing Class, as available under the law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and on behalf of all other persons similarly situated copyright holders, respectfully prays for relief against Defendants as follows:

1. certify this matter as a class action;

2. enter an order appointing Plaintiff as class representative and Plaintiff's counsel as class counsel;

3. enter judgment in favor of Plaintiff and each registration;

4. enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class (17 U.S.C. § 502), including enjoining defendant from continued copyright infringement and violations of the relevant provisions of the Copyright Act;

5. a temporary, preliminary, and permanent injunction enjoining and restraining Defendant, and its agents, servants, directors, officers, principals, employees, representatives, subsidiaries and affiliates, companies, successors, assigns, and those acting in concert with them or at their direction, from further violations.

6. injunctive relief that requires Defendant to pay for the services of a third-party auditor to identify the owners of all works reproduced and/or distributed by Defendants despite defendants' failure to first obtain a mechanical license prior to reproducing and/or distributing the Works, and further requiring Defendant to remove all such unlicensed tracks from its services until it obtains proper licenses for them;

7. restitution of Defendant's unlawful proceeds, including defendants' gross profits;

8. award compensatory damages to Plaintiff and the Putative Class in an amount to be ascertained at trial;

9. award statutory damages to Plaintiff and the Putative Class according to proof, including but not limited to all penalties authorized by the Copyright Act (17 U.S.C. §§ 504(c)(1), 504(c)(2));

10. award reasonable attorneys' fees and costs (17 U.S.C. § 505);

11. award Plaintiff and each Putative Class member pre- and post-judgment interest to the extent allowable;

12. award Plaintiff and the Putative Royalty Class all unpaid royalties; and,

13. award such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: July 7, 2017	**GARBARINI FITZGERALD P.C.**

By: *Richard M. Garbarini* (signature)

Richard Garbarini (RG 5496)